UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADRIENNE WEAR,

    Plaintiff,

v.                                                        Case No. 8:10-cv-1185-T-TBM

MICHAEL J. ASTRUE,
**Commissioner of the United States**
**Social Security Administration,**

    Defendant.
_____/

**O R D E R**

The Plaintiff seeks judicial review of the decision terminating her Supplemental Security Income payments on a finding that her condition had medically improved such that her disability ceased. The Plaintiff urges that her case be reversed and remanded for further consideration because the ALJ erred in concluding that her medical condition had improved, that such improvement was related to her ability to work, and in concluding that her disability had ceased effective October 1, 2002. For the reasons set out herein, the decision is affirmed.

A.

Plaintiff was fifty-five years old at the time of her administrative hearing in November 2007.[1] Plaintiff has a high school education. As she described her earnings

---

[1] At the outset of the hearing, there was discussion over Plaintiff's claim she was born in 1952 making her fifty-five years old or in 1957 as reflected in medical records before the ALJ and on Plaintiff's driver's license. As discussed below, it was ultimately determined she was born in 1952.

history, she was not an employable person and thus had no past relevant work. Plaintiff applied for Supplemental Security Income (SSI) payments in 1997. In July 2000, she was determined to be disabled by an ALJ as of April 1999 (amended onset date). (R. 338). In 2002, a continuing disability review was completed and Plaintiff's disability was found to have ended on October 1, 2002. That decision was affirmed but ultimately vacated and remanded by the Appeals Council in 2006 with directions for further consideration of the cessation finding.

A de novo hearing was conducted by an Administrative Law Judge (ALJ) on November 1, 2007. Plaintiff, who was represented at the hearing, testified that she is unable to work because she is dyslexic and she does not read. She claimed severe learning problems when in school and that she did not start reading until she was twenty. When asked if she could do math, she responded that she could count money. She transacts her business in cash. At the request of her counsel, the hearing was then recessed so that other medical records could be submitted and a copy of her birth certificate could be introduced into the record. (R. 1183-1200).

The follow-up hearing occurred on January 31, 2008. At the outset, the discussions again centered on Plaintiff's age. The certified copy of her birth certificate brought by Plaintiff indicated her birth was in 1952, as she had testified. Plaintiff again indicated that she was not an employable person. She cannot lift things or do physical labor and she cannot read and write well. By her account, she cannot sit or stand "for long periods of time" and cannot lift over five pounds. She claimed herniated discs in her neck and back and just moving about

could hurt her.  She has declined surgery on her back.  She had rotator cuff surgery on her right shoulder which did not help and her other shoulder hurts even more.  She experiences pain in her left groin area as well from arthritis.  The pain gets to the point that she cannot walk.  She has arthritis in all her joints.  She has problems putting her hands behind her back and above her head.  She has to have help opening doors because of a lack of strength.  Sometimes she can sit up to twenty minutes with no problems, and other times it hurts to sit for that long.  She claimed to be experiencing unexplained numbness across her head, face and into her arms.  Her neck and shoulders hurt her as well on a bad day.  When she is upset and nervous, her impairments are worse.  She drives only short distances due to pain and she gets easily lost.

Plaintiff claimed memory and concentration problems and poor organization.  She likes art, but does nothing to further this hobby because she is too depressed.  She has a hard time pushing herself to do anything.  She has seven children, ages thirteen, fifteen, sixteen, eighteen, twenty, twenty-three, and twenty-five that "keep [her] busy."  She likes to cook them dinner, but they are getting independent and want to do things for themselves.

She does not walk much except when shopping in the grocery store, but requires assistance to put her groceries into the car.  She can stand for ten to fifteen minutes before needing to sit.  By her account, she may do a few dishes in the sink, but it takes her a long time because she will take frequent breaks to sit or lie down.  However, she claims she cannot sit for too long because of her neck hurting.  She had to stand up during her hearing.

3

Upon questioning by her counsel, Plaintiff testified that she has difficulty learning new things or remembering information. She has difficulty with written directions, she does not read much, and when she writes things, others cannot read it. She requires assistance to complete forms.

As for her mental state, she testified that she has suffered from depression most of her life. She is on a new "extremely high dose" of medicine, which helps some. However, she claims her mental condition is getting worse. She was diagnosed with bipolar disorder. She is unable to function, she has no energy, she sleeps all the time, and she does not go out. She experiences feelings of worthlessness. She has problems staying on task and gets distracted such that she does not get anything done. She testified as to problems with concentration, memory, panic attacks, and being easily overwhelmed. She does not have many friends and does not like to be around people any more. Plaintiff takes Xanax for anxiety and Topamax for depression or bipolar disorder.

As for physical problems, Plaintiff claims she has gotten worse. She suffers from TMJ which gives her migraines to the point of getting physically sick. She has been diagnosed with diabetes. She has been breaking out in rashes and hives due to nerves. She has asthma for which she uses an inhaler and steroids. She used to take morphine, but now is taking Tylox. The medications she takes make her tired such that she needs to take a two-hour nap in the middle of the day. This has been going on for three to four years. She has problems with grasping and opening things. She cannot use her fingers for small things such

as buttons. She has trouble with repetitive lifting and cannot carry things because of her back pain. (R. 1206-30).

The ALJ next took testimony from Tennyson Wright, a vocational expert (VE). In pertinent part, the VE testified on a hypothetical question which assumed a person of Plaintiff's age, education and [no past] work history capable of light exertional work with no frequent pushing and pulling overhead with the dominant right upper extremity; only occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and understanding and carrying out [only] simple, routine, repetitive instructions using simple judgment with simple changes in the work setting and avoidance of detailed, technical, and abstract analysis and a wide variety of detailed tasks or tasks requiring reading and writing on a regular basis. On such hypothetical, the VE opined that such an individual could perform work as a small products assembler, bench assembler, and merchandise marker. According to the VE, those jobs are light and unskilled and allow for alternating positions. Given a hypothetical for an individual limited to lifting no more than five pounds, sitting limited to ten to twenty minutes, and standing limited to ten minutes at a time, the VE opined that no work would be available. Similarly, if that hypothetical was defined further to marginal lifting and carrying, with only twenty minutes for sitting and ten minutes for standing at one time, the VE opined that all work would be precluded. On questioning from Plaintiff's counsel, the VE indicated that if the individual was unable to attend work for at least three days out of a thirty-day month due to medical conditions, all work would be precluded. Likewise, the VE testified that no work would be available if the individual had to nap for approximately two hours out of an eight-hour day. (R. 1230-34).

On April 25, 2008, the ALJ found that, as of October 1, 2002, there had been a decrease in the medical severity of Plaintiff's impairments present at the time of the comparison point decision, i.e., major depression, hypertension, and a dysthymic disorder, and that such medical improvement was related to Plaintiff's ability to work because it has resulted in an increase in Plaintiff's residual functional capacity.[2] The ALJ then found that, beginning October 1, 2002, based on the then-current severe impairments related to cervical and lumbar spine bulges and disc herniations without stenosis and without cord compression, low average intellectual functioning with diagnosis of learning disability, anxiety and major depression or an adjustment disorder, hypertension, diabetes mellitus II, hypothyroidism, and status post right shoulder rotator cuff tear repair, Plaintiff retained the residual functional capacity to perform up to a limited range of light exertional work. Upon this finding and the testimony of the VE, the ALJ concluded that Plaintiff could perform jobs available to her in the local and national economy. Upon this conclusion, the Plaintiff was determined to be not disabled.[3] (R. 25-42). The Appeals Council considered additional evidence and denied Plaintiff's request for review. (R. 13-16).

---

[2] At the time of the comparison point decision, Plaintiff's impairments resulted in the residual functional capacity to perform medium exertional work but with mental limitations that precluded work activity. (R. 27, 722). As of October 1, 2002, the ALJ determined that Plaintiff's impairments present at the time of the comparison point decision decreased in medical severity such that Plaintiff could perform medium exertional, unskilled work with no limitations in areas of activities of daily living, social functioning and only moderate limitations in the area of concentration, persistence, or pace. (R. 29-30).

[3] The ALJ noted, however, that as of August 15, 2007, when Plaintiff turned fifty-five years old, she was disabled given the functional capacity for a limited range of light work. (R. 42). As recognized by counsel, Plaintiff subsequently was found entitled to SSI payments as of August 15, 2007, and is in current pay status. (Doc. 23 at 7, n.2).

6

B.

Consideration of the Plaintiff's claims is governed by certain principles. In order to be entitled to Supplemental Security Income payments, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 423(d)(3).

Where, as here, the claimant has previously been awarded benefits, the Commissioner may determine during periodic reviews that the claimant is no longer entitled to such benefits if the physical or mental impairment on the basis of which the benefits were provided has ceased, does not exist, or is no longer disabling. *See* 42 U.S.C. § 1382c(a)(4). In continuing disability cases such as this one, the Commissioner applies the procedures set out in 20 C.F.R. § 416.994. The first part of the evaluative process is whether medical improvement has been demonstrated.[4] A claimant's disability benefits may be terminated if there has been any medical improvement, if the improvement is related to the ability to work, and if the claimant is currently able to engage in substantial gainful activity. 20 C.F.R. § 416.994(b).

---

[4]The seven-step evaluation process is set forth at 20 C.F.R. § 416.994(b)(5).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See id.* at § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate that he has done so. While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. *Celebrezze v. O'Brient*, 323 F.2d 989 (5th Cir. 1963). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. *Miles*, 84 F.3d at 1400; *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).

In sum, the scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards

8

were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988).

C.

Plaintiff initially complains that the ALJ erred in finding that Plaintiff had medically improved since the comparison point decision (CPD). At the CPD, Plaintiff was found to have severe impairments including depression, hypertension and dysthmic disorder. (R. 722). In the ALJ's decision of April 25, 2008, Plaintiff was found to have the following severe impairments as of October 1, 2002, the cessation date: "cervical and lumbar spine bulges and disc herniations without cord compression; low average intellectual functioning with diagnoses of learning disability, anxiety and major depression or an adjustment disorder; hypertension; diabetes mellitus II; hypothyroidism; and status post right shoulder rotator cuff tear repair." (R. 27). By Plaintiff's argument, such does not reflect medical improvement. Further, Plaintiff urges that the ALJ's conclusion that Plaintiff has received and/or required very little medical treatment for her major depression, hypertension and dysthmia since the cessation date of October 2002 is contrary to the medical evidence. (Doc. 23 at 8-11).

Next, Plaintiff claims that "The Commissioner Erred in Finding that any Medical Improvement is Related to Plaintiff's Ability to Work." She notes that, although earlier in his decision the ALJ states that Plaintiff's impairments had decreased to where she could do a limited range of "medium" work, the residual functional capacity that he posed to the VE was based on a limited range of light work for which the VE identified some work Plaintiff could perform. She notes further that the ALJ posed a second hypothetical to the VE that was more consistent with her testimony regarding her physical pain and limitations caused by her pain,

9

accidents, and injuries, but the ALJ nevertheless fails to mention the second hypothetical–which would have precluded substantial gainful employment– in his decision. In support, Plaintiff claims the second hypothetical is supported by her testimony as well as the objective medical evidence and treatment received since 2002. (Doc. 23 at 11-14).

As a preliminary matter, the Commissioner responds that Plaintiff relies on various medical conditions that were not found as severe impairments in the prior disability determination of July 2000 to support her assertion that she has not improved. However, the Commissioner urges that for purposes of determining improvement as of October 1, 2002, the ALJ need only consider those conditions found as severe impairments at the time of the most recent favorable decision, i.e., July 12, 2000. And given Plaintiff's increase in Wechsler Adult Intelligence Scale III scores as well as her lack of treatment, the objective evidence supported the ALJ's finding that the Plaintiff experienced medical improvement in her impairments. As for Plaintiff's second claim, the Commissioner contends that the ALJ properly found that Plaintiff's medical improvement was related to her ability to work. To the extent Plaintiff challenges the second hypothetical the ALJ posed to the VE, the Commissioner urges that the ALJ was not required to rely on the VE's response to that hypothetical because it included limitations that were unsupported by the record. (Doc. 24 at 4-17).

"Medical improvement" is "any decrease in the medical severity of . . . impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs

10

and/or laboratory findings associated with your impairment(s)." *Id.* To determine whether or not medical improvement has occurred, the adjudicator:

> . . . will compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled to the medical severity of that impairment(s) at that time. If medical improvement has occurred, we will compare your current functional capacity to do basic work activities (i.e., your residual functional capacity) based on the previously existing impairments with your prior residual functional capacity in order to determine whether the medical improvement is related to your ability to do work. The most recent favorable medical decision is the latest decision involving a consideration of the medical evidence and the issue of whether you were disabled or continued to be disabled which became final.

20 C.F.R. § 416.994(b)(1)(vii). *Id.* Medical improvement is only related to an individual's ability to work "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision *and* an increase in your functional capacity to do basic work activities . . . ." 20 C.F.R. § 416.994(b)(1)(iii).

Given the regulatory scheme for determining medical improvement, I find that the ALJ did not err by finding that Plaintiff experienced medical improvement or that such improvement was related to her ability to work.[5] Here, the CPD is July 12, 2000. (R. 720-723). At that time, Plaintiff was found to have the severe impairments of major depression, hypertension, and dysthymic disorder. (R. 720). She was found to have the residual

---

[5]As the Commissioner notes, the problem with Plaintiff's claims is her reliance on impairments that did not exist at the time of the CPD to refute medical improvement. As set forth in the regulations, only impairments existing at the time of the CPD are considered when determining medical improvement. *See* 20 C.F.R. § 416.994(b)(1)(vii).

11

functional capacity to perform medium exertional work with no climbing of ladders, ropes and scaffolds; no exposure to extreme temperature changes; only frequent climbing stairs and ramps, balancing, stooping, kneeling, and crouching but no crawling; and "above moderate" limitations as to attention, concentration, persistence, and pace; "above moderate" limitations as to her ability to work in coordination with others without being distracted and as to her ability to behave in an emotionally stable manner; and limited to low stress routine work involving limited reading and math. (R. 721). And, given this functional capacity, Plaintiff was found disabled.[6] (R. 722-23). Also at that time, the ALJ "strongly recommend[ed]" that Plaintiff's condition be re-examined in twelve to eighteen months. (R. 722). In the most recent decision, in accordance with the regulatory framework, the ALJ considered Plaintiff's major depression, hypertension, and dysthymic disorder and determined that, as of October 1, 2002, the medical evidence supported a finding of a decrease in the medical severity of the impairments present at the time of the CPD, and that the medical improvement was related to the ability to work because there was an increase in her functional capacity to medium unskilled work with moderate limitations in concentration, persistence, or pace. (R. 27-30).

Substantial evidence supports the ALJ's findings. Regarding medical improvement, at the CPD, the ALJ relied on an April 21, 1999, psychological evaluation by Morris Sumner, Ed. D. Dr. Morris reported that Plaintiff was extremely tangential; seemed to lack mental discipline, control, and motivation; did not follow directions; had difficulty focusing on questions and did not remember dates; suffered from components of a post-traumatic stress

---

[6]Because no argument is made regarding the initial ALJ's finding of disability, I do not address the correctness of it herein.

12

disorder; was impulsive and used poor judgment; obtained a full scale IQ score of 76 (borderline mentally retarded range); had poor knowledge about the world and ability to learn from experience was poor; did not know the number of weeks in a year or the month in which Labor Day occurs; had a seriously impaired attention span; and was a very emotional and unstable lady. (R. 260-64, 721). The only physical impairment found severe at the time of the CPD was hypertension, and it appears that the ALJ determined Plaintiff could perform medium exertional work with certain postural and environmental limitations after finding that Plaintiff's subjective complaints were generally credible; no evidence of physical impairment was discussed in the decision. (R. 721).

In the current decision, the ALJ concluded that there had been a decrease in the medical severity of Plaintiff's impairments (major depression, hypertension, and dysthymic disorder) as of October 1, 2002, based primarily on the findings in a psychological evaluation conducted in July and September 2002 by Karen Pirnot, Ph.D.[7] Therein, Dr. Pirnot reported that Plaintiff was frequently distracted and had difficulty attending to tasks; appeared to have average thought processing; had unimpaired mental control and was able to associate common objects to abstract common sayings and to perform simple mental calculations; had poor immediate memory but somewhat improved delayed memory; had average common sense and judgment and practical knowledge; and poor memory and concentration. On intelligence testing, Plaintiff achieved a verbal IQ score of 91, a performance IQ score of 79, and a full

---

[7]The Wechsler Adult Intelligence Scale-III and the Wechsler Memory Scale-III were administered in July 2002 and in September 2002 a clinical interview with mental status was conducted. (R. 474-79).

13

scale IQ score of 85. When asked by the psychologist about the improved results from those administered in 1999, Plaintiff indicated that at the time of testing in 1999 she was severely depressed. Dr. Pirnot diagnosed Plaintiff with a learning disorder, not otherwise specified, and a global assessment of functioning (GAF) of 45.[8] (R. 474-79). As for Plaintiff's physical condition, while the ALJ noted emergency room treatment for back, neck, and chest pain; the results of a consultative evaluation; and treatment Plaintiff received after an accident (R. 28); the only mention of hypertension was that it was assessed by the consulting doctor. (R. 28-29).

Given these findings, which are supported by the record, I am unable to conclude that the ALJ erred by finding medical improvement. Notably, Plaintiff admitted that she was severely depressed in 1999 and that was likely why her IQ scores were lower (R. 479), and aside from the findings of poor memory and concentration (and Plaintiff's self-report of complaints), the clinical findings by Dr. Pirnot support a decrease in symptoms since the time of the psychological exam in 1999. *Compare* (R. 260-64) *with* (R. 474-79). And, contrary to Plaintiff's urging, from 1999/2000 to 2002 the record reveals no treatment for mental health

---

[8]GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV). A a GAF of 41-50 indicates either serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* Of note, the ALJ discounted Dr. Pirnot's opinion with respect to the GAF score as inconsistent with her clinical findings (R. 30) and Plaintiff does not challenge his doing so on this appeal.

14

related complaints and Plaintiff fails to point to any during that period.[9] While Plaintiff's orthopedic problems may have been worsening, the orthopedic impairments do not factor into the medical improvement consideration because they were not found to have existed as severe impairments at the CPD.

Substantial evidence also supports the ALJ's finding that the medical improvement was related to Plaintiff's ability to work because there was an increase in Plaintiff's residual functional capacity. In particular, at the CPD Plaintiff had the functional capacity to perform a limited range of medium work with certain postural and environmental limitations but with essentially disabling mental limitations (R. 721), and as of October 2002, she had the functional capacity, given the impairments present at the CPD, to perform unskilled medium exertional work with moderate limitations in concentration, persistence, or pace.[10] (R. 29-30). Of note, when only her impairments present at the CPD are considered, Plaintiff does not seriously challenge this finding. Nor does she point out opinions finding otherwise and she does not challenge the ALJ's assessment of her credibility.

For these reasons, Plaintiff has not demonstrated that she is entitled to relief given the ALJ's findings that she experienced medical improvement and that such improvement was related to her ability to work.

---

[9]As noted by the ALJ (R. 29), Plaintiff reported in 2004 that she had not received any anti-depressant medication or psychiatric treatment for several years. (R. 684, 691).

[10]The state agency opinions support an RFC for simple (unskilled) medium exertional work with moderate difficulties in maintaining concentration, persistence, or pace. *See* (R. 488, 500, 514, 521, 523-30). And, the rather brief medical record during the period up to October 2002 does not conflict with that assessment. *See* (R. 449-52, 457, 482-84).

D.

For the foregoing reasons, the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence. The decision is affirmed. Accordingly, the Clerk is directed to enter Judgment in favor of the Defendant and to close the file.

**Done and Ordered** at Tampa, Florida, this 29th day of September 2011.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record